ROSENZWEIG v. RAUBITSCHEK et al.   (No. 6458.)

(Supreme Court, Appellate Division, First Department.   December 4, 1914.)

1. BROKERS (§ 88*)—ACTIONS FOR COMMISSIONS—SUFFICIENCY OF EVIDENCE.
    In a broker's action for commissions, in which he claimed that he was employed to negotiate a sale or exchange, that he interested the other brokers, who negotiated an exchange, and that they promised to divide the commissions with him, to the knowledge of defendants, while defendants claimed that plaintiff had nothing to do with the exchange, evidence *held* sufficient to make a question for the jury on this issue.

    [Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 121, 123–130; Dec. Dig. § 88.*]

2. JOINT ADVENTURES (§ 7*)—RIGHTS OF PARTIES—COMMISSIONS.
    Where a broker, employed to negotiate a sale or exchange, interested other brokers, who agreed to divide their commissions with him, and who negotiated an exchange, he was bound by their agreement with his client that commissions would not be charged, until a resale of the property

taken by his client, in an action in which he sought to recover on the theory of a joint venture or partnership.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. § 8; Dec. Dig. § 7.*]

3. JUDGMENT (§ 240*)—JOINT OR SEVERAL—PARTIES—ELECTION.

In a broker's action for commissions against the person who employed plaintiff to negotiate a sale or exchange, and a corporation claimed to be such person's undisclosed principal, plaintiff should have been compelled to elect, and, though no election was requested, a judgment against both defendants could not be sustained.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 423–425; Dec. Dig. § 240.*]

Appeal from Trial Term, Bronx County.

Action by William Rosenzweig against Max H. Raubitschek and others. From a judgment on a verdict for $625, against the defendants Seventy-Fourth Street Holding Company and Isaac Polstein and from an order denying a new trial, they appeal. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, DOWLING, and HOTCHKISS, JJ.

Beekman, Menken & Griscom, of New York City (Stephen P. Anderton, of New York City, of counsel), for appellants.

Boehm & Steinberg, of New York City (Louis Boehm, of New York City, of counsel), for respondent.

CLARKE, J.  The complaint alleges that the defendant Polstein represented himself to the plaintiff as being the owner of the house and lot known as 323 West Seventy-Fourth street, and plaintiff relied upon said representation; that in October, 1913, Polstein engaged the plaintiff to render services as a broker to obtain a purchaser, either for cash or by exchange of property, for said premises, and the plaintiff agreed to render such services and obtain such purchaser upon the terms mentioned by Polstein, or upon such other terms as should be satisfactory to him; that thereafter the plaintiff rendered services in procuring a purchaser, and, acting together with Raubitschek and Thomas L. Reynolds, Incorporated, did procure a purchaser, ready, willing, and able to purchase the premises for $125,000,. and upon terms satisfactory to the defendant Polstein, and said purchaser was accepted by defendants Polstein and Seventy-Fourth Street Holding Company; that the usual and customary broker's commissions upon the sale of real estate is 1 per cent. of the selling price, or, in the case of an exchange, 1 per cent. of the value of the real estate as agreed upon for the purposes of exchange; that it was agreed between the defendants Raubitschek and Thomas L. Reynolds, Incorporated, and the plaintiff, that the commissions on the sale of said premises should be divided one half to the plaintiff and the other half to the said defendants; that thereafter plaintiff discovered that Polstein was not the owner of record of said premises, but that the Seventy-Fourth Street Holding Company was record owner and the undisclosed principal of the defendant Polstein; that the plaintiff has requested the defendants

Raubitschek and Thomas L. Reynolds, Incorporated, to join with him as plaintiffs in this action to recover the commissions due as aforesaid, and they have declined so to do; that the reasonable value of the services performed by the plaintiff and the said defendants is the sum of $1,250; that no personal judgment is sought against the defendants Raubitschek and Thomas L. Reynolds, Incorporated, herein. Wherefore plaintiff demands judgment against the defendants Polstein and the Seventy-Fourth Street Holding Company for the sum of $1,250, with interest from the 15th of December, 1913.

The answer of the defendant Seventy-Fourth Street Holding Company which alone appears in the record, after denials, sets up as a separate defense that on or about December 6, 1913, it entered in good faith into an agreement in writing with the defendant Raubitschek and one Thomas L. Reynolds, which was attached to the answer, and that by said agreement the Holding Company becomes obligated to pay to the said Raubitschek and Reynolds, according to the conditions thereof, the brokers' compensation or commission in the transaction referred to in the complaint, and that this defendant thereby fully satisfied and discharged any and all claims and demands for such compensation or commissions.

[1] Plaintiff's story is as follows: He was a real estate broker. In the fall of 1913 Polstein told him he had a private house, 323 West Seventy-Fourth street, which he had taken in exchange. He said the house was empty, and he was very desirous of selling it for cash. If he could not sell for cash, he was willing to take other property in trade, preferably property that he could improve. Plaintiff undertook to make a deal for some property at Edgemere, but after some negotiations that fell through. Subsequently plaintiff met Raubitschek, another broker, with whom he had previous dealings. He knew that he was associated with Reynolds. Plaintiff told Raubitschek he had Polstein's house for sale. Raubitschek said he felt sure he had a buyer and would like to meet the owner of the property. So plaintiff took Raubitschek and Reynolds to Polstein and introduced them to him. They told Polstein they had a buyer, Mr. Felix Isman, and negotiations went on with Isman up to and including the drawing of a contract, which was submitted to defendants' attorneys and then delivered to Raubitschek and Reynolds for execution by Isman. Every one agrees that in this transaction all three were acting as the brokers, and that commissions were to be divided 50 per cent. to Rosenzweig and the other 50 per cent. to Raubitschek and Reynolds. But this contract was not carried out. The plaintiff's testimony is that, after it had been outstanding for about two weeks, Polstein instructed him to go over to the office of Mr. Reynolds and get all those papers returned to him.

"He had an abstract of title belonging to Mr. Polstein, the survey, and the contract for the property. They refused to return those papers, claiming that they ultimately expected to close the deal. I went back and reported that to Mr. Polstein. Mr. Polstein was very angry, it being held up so long; got his bookkeeper and stenographer and dictated a letter, in my presence, * * * that all their connection in that matter, as far as that property 323 West Seventy-Fourth street is concerned, he withdraws it; * * * that he

did not want to have any further dealings with them as far as that matter was concerned; that, should they desire to negotiate for that house there, all their negotiations would have to be conducted through me at that time or any other time."

There is a dispute about that letter. The letter offered in evidence is dated November 14th, and, while it breaks off negotiations, it does not state that any further negotiations should be through Rosenzweig. Rosenzweig, however, swears that the letter produced is not the letter that was dictated; that he saw that letter dropped in the mail chute; that was in the morning, and this letter appears to have been sent by special delivery, and is postmarked 8 o'clock that night. The next morning plaintiff went over to Reynolds and Raubitschek. They acknowledged receipt of the letter Mr. Polstein sent the preceding day, and they felt very grieved that Mr. Polstein should take the sale of that property out of their hands—

"for the reason that, if this deal were not consummated, they mentioned the fact to me that they had a purchaser for the house—rather had an exchange which they felt pretty sure they could consummate. They asked me whether I could do anything toward getting them back into the good graces of Mr. Polstein. They told me they were ready to return the other papers, which they did that day. They returned the abstract of title and survey, but they did not return the contract." That morning "Mr. Reynolds and Mr. Raubitschek told me that they had Mr. McMillan, who owned the northwest corner of Ninety-Seventh street and West End avenue, through whom they figured they had some negotiations pending,' and they asked me whether I would please stay out of the matter—they did not want to have too many brokers in it. They told me there and then that if they made a cash sale of that house there for Mr. Polstein, or whether they made an exchange, they would pay me 50 per cent. of the commissions that we were entitled to, and on that statement of theirs, that they would do that, I did not bother further more about the matter. I only reported that to Mr. Polstein, and Mr. Polstein told me, he repeated that statement when he wrote that letter, that he would absolutely give me the whole sale of that house. * * * I told him they made that agreement with me, that they would divide 50 per cent. to them and 50 per cent. to myself. He was satisfied with it. It was the same agreement he had on another matter. Q. What is the next you know of the transaction? A. I had been coming in to see Mr. Raubitschek and Mr. Reynolds probably once or twice a day thereafter. They told me they were making progress in that deal with Mr. McMillan. All of a sudden they told me they did not think the deal would go through. About four or five days afterward, I cannot recollect the exact day, I picked up a paper one night and saw the report of a sale, reported in the evening papers, between Samuel McMillan, made by Raubitschek and Reynolds, for the corner of Ninety-Seventh street and West End avenue and of 323 West Seventy-Fourth street."

There was another transaction in which these three brokers figured with Mr. Polstein, and on which they divided their commissions 50—50, about this time. Polstein denies that plaintiff reported the conversation to him under which he was asked to keep out and he would receive one-half of the fees. Raubitschek and Reynolds deny that they made any such proposition to him. They say the whole thing fell through when Isman declined to carry out and execute the contract. They had known McMillan for a number of years; that they never said anything to plaintiff about McMillan; that the transaction with him took only two days; that it was an entirely independent affair; that they arranged for an exchange of property with him, and that in

the contract they agreed upon a commission of $1,000, to be paid on the sale of the lots transferred or exchanged, and that they had received none of that commission.

Polstein testifies that his property was put into that exchange at $115,000; that no brokerage was paid; that the agreement with the brokers was that they should resell the property which he took in exchange for a certain amount, and the brokers were to be paid when the lots were resold, and they have not been resold. The record title was in the Seventy-Fourth Street Holding Company, which Polstein testifies was created for him.

The court charged as follows:

"I leave the question to you entirely on this point: Was the sale that was finally made to Mr. McMillan so made in pursuance of the original authority given by Polstein to the plaintiff, to procure a purchaser, or was it made by Messrs. Reynolds and Raubitschek independently, and not pursuant to any other arrangement made by them with Rosenzweig? * * * The question, gentlemen, for you to determine, is whether the final sale, the actual sale, eventually made, was part of the original transaction. If it was, the plaintiff is entitled to recover; if you find that it was not, the defendant is entitled to your verdict."

The jury found a verdict for the plaintiff—

"for the amount he sued for, $625.
"The Court: Which defendant do you find against?
"The Foreman: For the plaintiff.
"Mr. Menken: I object to the verdict, and ask the court to declare a mistrial on the ground the verdict of the jury is improper.
"The Court: You find against which defendant?
"The Foreman: For the plaintiff.
"The Court: Against which defendants? There are several defendants.
"The Foreman: I said for the plaintiff.
"The Court: Against whom?
"The Foreman: Against Polstein and the Seventy-Fourth Street Holding Company.
"Mr. Menken: I object to the finding of the verdict. Its announcement is irregular. I except, and ask the court to find a mistrial.
"The Court: There is no personal judgment asked against the other two defendants. The court directs the reception of the verdict as against the two defendants, against whom personal claim is made.
"Mr. Menken: I except to your honor's finding. Both cannot owe the money. It must be one or the other.
"The Court: A verdict for $625."

The issue of veracity between the plaintiff and the defendants was properly to be determined by the jury, who saw and heard them. The defendants were elusive and evasive. There is no question but that during this whole period of time in at least two transactions the arrangements were as testified to by the plaintiff and agreed to by the defendants, and it is not difficult to believe that the same relations continued upon the same terms. The jury so determined. Upon this issue there seems no ground for interference with the verdict.

[2] There are several difficulties, however. In the first place, upon the view most favorable to the plaintiff, the verdict was $50 too high. The usual commission, as agreed by all parties, was 1 per cent. The defendant Polstein testified, without contradiction, that his property was put into the exchange at $115,000, which would make the 1 per.

cent. $1,150, and, of course, one-half of that is $575, instead of $625. The written agreement pleaded in the answer limited the commissions on that exchange to $1,000 upon the sale of the lots, but the agreement was not put in evidence. There is the testimony of Polstein in regard to this agreement that the payment of the brokerage on the McMillan sale was to be made when the lots were resold, and he testified that the lots have not been resold, and that he has paid no brokerage. The complaint asks for the full amount of the brokerage, namely, $1,250, upon the claim that the property was sold for $125,000, upon the theory of a joint venture or partnership as for one cause of action, making the copartners parties defendant because they would not sue. But the jury gave the verdict evidently for one-half thereof, but made a mistake as to $50 as indicated. But the plaintiff does not appeal, and the defendants, on the motion for a new trial, expressly excepted insufficiency of amount. Upon the theory of the action that plaintiff and the defendants Reynolds and Raubitschek were quasi partners, plaintiff was bound by the latter's agreement, as to which there was no dispute. Plaintiff's own testimony was that:

"They told me there and then, if they made a cash sale of that house there for Mr. Polstein, or whether they made an exchange, they would pay me 50 per cent. of the commissions that we were entitled to, and that on that statement of theirs, that they would do that, I did not bother further more about that matter."

So, on his own statement of his contract with them, he was only entitled to 50 per cent. of the commissions that "we were entitled to" and that depends upon the agreement that Reynolds and Raubitschek made with Polstein, and the only evidence in the case in regard to that is that they were entitled to be paid when the lots were sold and from the proceeds thereof, and as no lots have as yet been sold there is no sum that they were entitled to.

[3] Again, the judgment is against both Polstein and the Holding Company. Polstein was either the principal or he was the agent of an undisclosed principal, the Holding Company. The title to the property was in the Holding Company. I do not see how judgment can be had against both. Tuthill v. Wilson, 90 N. Y. 423; Cherrington v. Burchell, 147 App. Div. 16, 131 N. Y. Supp. 631. As the principal is now disclosed, and was made a party defendant, plaintiff should have been compelled to elect; but no such election was requested, although motions were made from time to time to dismiss as against the Holding Company. I do not see how this judgment in its present shape can be sustained. Nor does it seem possible for this court, upon this record, to direct the entry of a proper judgment; this being a common-law action.

The jury have determined that there was a joint adventure or quasi partnership between the three brokers; but the other matters necessary for the rendition of a proper judgment are left in so uncertain and chaotic a state that we are compelled to reverse the judgment and order appealed from, and order a new trial, with costs to the appellants to abide the event. All concur.